Case 13-1992, 13-1993, and 13-1994, Stryker Corporation et al. v. National Union Fire Insurance et al. Oral argument, 15 minutes to be shared by the plaintiffs and unarrested party, and 15 minutes for the defendant. Good morning. Good morning, Your Honor. David Gass on behalf of Stryker. TIG has agreed that Stryker may take the entire 15 minutes. And I'd like to reserve half my time to respond to XL's cross-appeal on the penalty interest issue as well as rebuttal. All right. Very well. I'll address the self-insured retention issue. The only issue, Your Honors, that Stryker appealed was the ruling by the district court on remand that Stryker and not XL is liable for the $2 million self-insured retention. As a result of that ruling, XL has not paid about $3.5 million in settlements, defense costs, and penalty interest that it would otherwise have owed Stryker under this court's 2012 ruling. The controlling rule of law here is waiver. Once a party waives a right, that right is waived forever, even if there is a later change in the law. And XL waived its right to challenge the 2008 retention ruling and assert that Stryker is now responsible for the $2 million retention in three independent ways. First, it did so when it paid the retention five years ago in a voluntary settlement with Pfizer so that it could exhaust its policy. Secondly, it did so when it went to the district court right after that settlement and told the district court that it was paying the retention so that it could exhaust its policy. And the third way it waived is in the appeal to this court. It did not appeal the retention ruling. And more about that later. I think XL's waiver is best understood in the context of several of the district court's rulings and the appeal. The case has been going on a long time. The claims arose in 2000. XL denied coverage in 2001. Stryker had to defend. And it entered into settlements of some $7.6 million, mostly in 2001-2002. So by 2007, we had a five-day trial before the district court on liability. The district court ruled that XL had breached the policy. And this court affirmed that ruling. We then went on to the damage phase in 2008. Two significant rulings. Number one, the district court following this court's holding in capital reproduction ruled that XL was responsible for the $2 million self-insured retention. This is the district court's ruling? This is the district court's ruling. That was appealed by XL, right?  Well, the judgment was appealed, wasn't it? Well, the judgment was appealed. Okay, once you appeal the judgment, haven't you appealed the issues? Why is not the appeal of a judgment all the rulings by the district judge, unless you fail to preserve an issue in your appellate brief? I mean, I could see that argument. But normally, when you appeal a judgment, you appeal all the rulings. That is true. You don't even have to identify the rulings. An appeal of a judgment is an appeal of all the issues. But this court's rules say that's not enough. When you appeal, you must, under the court's rule, identify the issues on appeal in the statement of issues and in the argument. And the court has made it very clear that if you don't do that, you waive them. So you're saying their brief was inadequate, not the appeal? Well, no. When you appeal a final judgment, you appeal all orders. You don't have to identify that. So are you arguing their brief was inadequate in the first appeal? Yes. As opposed to their claim of appeal was adequate. Well, when they appeal, you're right, Your Honor. When they appeal the final judgment. It's important. Okay. Okay, so the statement of issues were ambiguous as to whether they're appealing the $2 million? I think they were not ambiguous at all. What they were appealing, and this is an important point. If I could go back to the ‑‑I want to answer your question, but I want to put it in context. I don't have their brief in front of me, but I do have our prior panel opinion, which reversed the ruling as to the $2 million. Your Honor, I beg to disagree. That's the way I read it, though. Well, the opinion identified, this court's opinion identified specifically the six rulings that were on appeal. The retention ruling. Excel's liability is limited to their $15 million policy limit. Well, the $2 million self-retention or deductible is in addition to the $15 million policy limit. So when our court holds that their insurance policy liability is limited to their $15 million limit, hence the $2 million deductible, they're not liable for it. Your Honor. It's affirmed in part and reversed in part. If I could address that. It was very clear in all of the papers and in the district court that the $2 million self-insured retention comes first. Then you have the $15 million limits. And then you have the amounts over and above. It's a deductible, is it not? It's a self-insured retention. It's a high deductible. That's correct. Okay, it's no different than a deductible, is it? No, not really. And our court said that their policy is limited to the $15 million. Well, that doesn't include the deductible. And that's what the district court ruled, that they're responsible also for the deductible because they didn't defend it. And we reversed that. No? You did not, Your Honor. Oh, we did not. And this is why. And the reason why Excel never appealed that issue is because back in 2009, it was faced with penalty interest of about $5,000 a day. Remember, the district court entered the ruling on penalty interest and the retention ruling. Excel decided that it had to cut its losses. The only way that it could cut its losses and stop the penalty interest clock was to exhaust its policy by entering into this settlement with Pfizer. But in order to exhaust, which was critical, and because of the retention ruling, which was the state of the law at that time, it had to pay the retention ruling. It had to pay the $15 million plus the $2 million. And it had to do that in order to exhaust. If it didn't exhaust, the penalty interest clock would continue to run. So it entered into this settlement with Pfizer. And then less than a week later, it filed a motion with the district court seeking a ruling of exhaustion so it could stop the clock. And it told the district court in its brief and at oral argument, and this is in our brief, that because of the retention ruling, its limits were effectively $17 million, and it was paying $17 million. In fact, it paid a total of $26 million, but it allocated $17 million to amounts that it viewed would erode the policy limits. So it told the district court that it was paying the entire amount in order to get a ruling on exhaustion. Now, when it filed that motion, it was hoping to stop the penalty interest clock. What happened is later that year, in 2009, the district court denied the motion and ruled based on capital reproduction, an argument we never even made, that it was extended over and above the policy limits. What happened then is it was a $14 million issue at that point. The self-insured retention was a $2 million issue that was out of the case. They paid it to try to exhaust in a settlement, and the laws were ______. Maybe I'm oversimplifying, but getting back to Judge Crippen's question, doesn't it all boil down to this, the previous decision of this court says their liability is limited to $15 million. You're saying it should have been $17 million. That's not what this court said, is it? But this court identified the six rulings at issue. Here's page 357 of the opinion. Quote, Excel's liability to Stryker under the policy is limited to the aggregate limit of the liability on occurrence under Excel's policy, which is $15 million above the self-insured retention of $2 million. I mean, how could it be less clear than that? I think that's exactly my point, though. It's $15 million above. The $2 million self-retention goes first. It doesn't say it includes the $2 million. It's above the deductible. I mean, I don't think you're reading English. I did read it very carefully, Your Honor, and I also know that the ______. Well, this court very clearly identified the six rulings on appeal. It said that, and the retention ruling was not one of them. The excess judgment was. And the reason why it was never appealed, it was never in the statement of issues. It was never in the argument. And as a result, we didn't even address it. We said they didn't appeal it. They appealed the excess judgment ruling, which was the $14 million issue. Maybe you should have addressed it then. I mean, you took your chances by saying it was waived, and that's your backup position. But if we don't find a waiver, we address issues. So, I mean, that's your own fault if you didn't address it, I think. All right. Any other questions? Your time is up. Well, Judge John Bell said that you did expressly argue waiver in the first appeal. You did, didn't you? No, we did not. Well, here's what happened in the first appeal. We said in a footnote in our first brief. The court did not find any waiver. The court did not address a waiver. What happened, Judge Graham, is we identified in a footnote in our first brief, they didn't appeal that retention ruling. They said in their brief they did, and they cited to pages 32 and 34. If you go through 34, if you go look at that, what they did in their first brief was they only addressed the amount over and above the limits because that was the issue. The $14 million was the issue. The retention ruling had been paid years ago, and it was no longer an issue in the case. The only reason they're making an issue now is because instead of limiting capital reproduction, this court overruled it. So now they're trying to go back and say, well, this retention ruling that they had paid years ago in a settlement somehow should be reversed. And I would also say this. I think Judge Bell, in his opinion on this issue, struggled. He said there was ambiguity about the scope of the appeal. Judge Bell even indicated there was some question about this court's opinion, that it was imprecise. So he struggled with this in trying to make his ruling, And we believe he struggled for a reason, because we don't think that Exel ever appealed the issue. They never appealed the issue because they had paid it in a settlement years before, and they paid it because it was in their self-interest, in their view, because they were trying to stop the penalty interest clock. By the time we got to this court, the big issue was the $14 million amount over and above the policy limits. The retention ruling from 2008 was long gone. It had been paid, and it was no longer an issue in the case. And you can see that. If you look at the statement of issues that Exel put in its brief and its argument, it said nothing about the retention ruling. And this court mentioned the retention ruling once but did not reverse it. It did reverse the excess judgment rule. What does this mean? For these reasons, we reverse the district court's judgment that the aggregate limit of liability of the Exel policy does not apply to the judgments in Stryker 1 and 2. Your Honor, that's the The district court found self-insured retention and the aggregate limits. The district court relied on a now federal case, capital reproduction, which applied Michigan law, which has now changed that holds that in a breach of a duty to defend case, the liability is an addition. The liability limits don't apply necessarily, and the deductibles are subject to recovery and that authority in Michigan has been overruled, but that's what the district court relied on to allow the $2 million, and that's what we reversed. I mean, I don't know how else you read it. If they had appealed the retention ruling, if they had the 2008 ruling. Well, whether they appealed it or not, we ruled on it, did we not? I mean, our court did. But you did on capital reproduction, but in the context of the excess judgment ruling. And I guess the point is, if you don't appeal a ruling, you can't go back. Once a waiver is made, you can't undo the waiver because you're changing the law. If we were under a judgment on appeal, whether it was waived or not, I think that's what the law of the case is. And maybe the panel should not have ruled as they did. Maybe the issue wasn't before them, but that's the judgment of our court, and that's the law of this case. One more point, if I might. No, isn't it? It's the law of the case as it relates to that, but the law of the case does not undo a waiver. The law of the case does not undo a waiver. Yes, it does. We're responsible to enforce the judgments of our court, and we enforce the judgments of other panels of this court as well. We're all one court here. And whether or not they should have ruled, it certainly appears to me that they did. I respectfully disagree. I don't think they identified that issue. And it goes to this issue about where does the self-insured retention fall. It's below the $15 million. So when they talk about it's above the $15 million, that has nothing to do with the self-insured retention, which is the first $2 million paid. Everything about the appeal, Your Honors, was about this $14 million excess judgment that Judge Bell awarded. That was the big-ticket item. The $2 million had been paid years before. And we cited Michigan and Sixth Circuit authority, this is not controversial, that if parties enter into a settlement agreement based on the state of the law, you may never undo that settlement just because the law changes. And that's exactly what happened here. Okay. Anything further at this time? All right. You'll have your rebuttal. Thank you very much. Good morning. Good morning, Your Honors. May it please the Court. My name is John Hacker. I'm here for appellee XL. I'll just address the SIR issue briefly because I think Your Honors have it clearly figured out. The two points I would make are, first of all, I think Mr. Gass is confusing rulings appealed and issues appealed. I think you conceded correctly to you, Judge Griffin, that the rulings are encompassed by the merger rule in the judgment. So the judgment appeals the ruling. The question is what issue was resolved on appeal by this court in Stryker 1. And the issue was that the limits of liability consistently described, by both XL and the court, as $15 million. That's all that XL was liable for is a total of $15 million. And the court said that's the limit of its liability, and it overruled capital reproduction, holding that anything beyond that had to be a matter of consequential damages. The issue before the court was stated by XL in its brief, and it was the second issue stated, assuming XL breached the duty to defend, whether Stryker is entitled to consequential damages exceeding contractual limits, where XL's breach did not cause the excess settlement damages, and the excess settlements are covered by excess insurance. That's the issue resolved by this court, and it is controlling going forward. Mr. Gass, I think, is just incorrect in you saying the word excess means only above both $15 and $2 million. Excess, in insurance law and in plain English, refers to an amount more than $15 million. It doesn't matter whether the insured incurs the first $2 million or a later $2 million or anything like that. The point is the insurer has agreed to take on a liability of $15 million. Anything more than that is an excess amount, and that's what that's all about. So I think it's quite clear that the prior ruling was not law of the case. There's no law of the case problem, I should say. Counsel, do I recall correctly that you did specifically address this issue of self-insured retention in your briefing in the first appeal? Yes. To be clear, Your Honor, we addressed the issue of whether or not Stryker could claim damages exceeding $15 million. That was the issue. The rulings, neither of them was explicitly addressed at length because they were the same ruling. The ruling was based on the same issue, whether or not capital reproduction was good law. So when we're talking about the issue of are they entitled to more than $15 million, that issue, by its terms, resolves both rulings, and that's what this court did in its prior opinion. The decision in capital reproduction, did you argue that that decision had been abrogated by Michigan law? That was the sum total of our argument on this issue. That applies to the reproduction as well? Absolutely. That's precisely the point. The SIR ruling was based on a view that capital reproduction was still good law and that all policy limits were effectively eviscerated. We said that's incorrect. This court agreed. On remand, the court properly analyzed the briefs, this court's prior opinion, and exercised its authority and discretion to reach the issue. If one views this as a question of waiver, which is now, today, how Mr. Gass presents it, and I don't think that's quite the way to look at it, but if you accept that view, then the case is completely easy because every court, in any situation, has discretion to reach an issue that has been waived. So if an issue has been waived, a court can still reach it in its discretion, so long as there's no prejudice, and there's no reason, there's no prejudice here whatsoever. Which goes to the last point I'd make, which is Mr. Gass does not address the exception to the law of the case. Accepting every word of what he said is true, Excel still prevails because there is a recognized exception to law of the case, which is for manifest injustice. And the one thing every person in this courtroom who's paid attention to this issue agrees with is that the SIR ruling is wrong as a matter of law. Stryker doesn't disagree with that. Stryker agrees that it's wrong under this court's prior opinion, they just want to enforce it. The district court properly applied this court's prior opinion, realized that its prior interlocutory ruling was incorrect, reversed that ruling, and did exactly what we expect a district court to do under these circumstances. If I might, I'd like to turn to the penalty interest cross-appeal that we've raised, which is our submission that there should be no penalty interest on the $6.2 million in excess settlement payments for which Excel was not liable. This court's prior opinion in Stryker 1 held that penalty interest would be owed only on amounts for which Excel is, quote, actually liable. And because of the Pfizer payment, which exhausted the policy limits at $15 million, Excel is not liable for the excess settlement payments. So it follows, first of all, from this court's prior opinion, it also follows from the plain terms of the penalty interest statute itself. 500.20064 limits, strictly limits penalty interest to, quote, benefits paid, end quote, that are within, quote, policy limits. So within two respects, the excess settlement payments are not subject to penalty interest. First of all, they were not benefits. They were not paid. And they were beyond the policy limits. So neither condition under the penalty interest statute is satisfied here. You said they weren't paid. As I recall, the settlement with Stryker involved a settlement benefit of some $26 million, correct? So how is it that that's not paid? Are you arguing that because it was a compromise that somehow it's not paid or not a benefit? Let me clarify. The settlement, the payment was made to Pfizer. Right. And that is a benefit that is paid to Stryker. That's absolutely true. But what's also true is that Stryker, the trial court in the Stryker 2 decision held that Stryker was not entitled to penalty interest on the benefits paid to Stryker through the Pfizer payment, if you understand what I'm saying. I do. And Stryker didn't appeal from that ruling. The trial court held that they have no entitlement to penalty interest on the Pfizer payment. Moreover, the court held that Pfizer was a third-party tort claimant under the Michigan statute. And the Michigan legislature has seen fit in its judgment to say that a third-party claimant in Pfizer's position has the right to claim a penalty interest. So what happened is when we paid Pfizer, we paid a benefit to Stryker and paid Pfizer $8.5 million in interest. That was effectively, if any party had a claim to penalty interest on that benefit payment, it was Pfizer. And that's the compromise. Pfizer compromised whatever claim they had to penalty interest under the statute. That exhausted, that terminated any entitlement to penalty interest because what was left after that payment exhausted Stryker's benefit were excess settlements. And under the plain terms of the statute, they have no right to penalty interest on an amount that isn't a benefit paid. Now what the trial court said is a version of this. The trial court said, well, before there was a Pfizer payment, Excel was liable for those settlement payments. And so the trial court said, I'm going to treat you as if you were actually liable for the payments and charge you with that penalty interest. The problem with that is that before the Pfizer payment was made, and before the Pfizer payment was made, Excel was also liable for the Pfizer payment. Stryker had tendered a number of claims, a number of settlements in the Pfizer judgment that vastly exceeded the amount of potential liability under the Excel policy. So you have to sort out what benefit, on what benefit penalty interest is going to be paid. And that's answered by the statute itself. The penalty interest can only be paid on, is only subject to a benefit paid. The only benefit paid was the Pfizer benefit. And as I've already said, the Stryker 2 trial court, in a ruling that Stryker elected not to appeal, held that Stryker had no entitlement to penalty interest on the payment to Pfizer, and that Pfizer was in the position of a third-party tort claimant who had a claim to penalty interest under the statute. The court ultimately ruled that it didn't have a claim because its claim was reasonably in dispute. But it was in the position of a party entitled to claim  It follows that when we compromised with Pfizer, paid Pfizer, $8.5 million in interest, that constitutes the only possible claim to penalty interest that's out there, and under the plain terms of the statute, there's no basis for Stryker now claiming penalty interest on amounts that are not benefits paid. They exceed the policy limits, and they were not paid by Excel. The last point I'd make, and otherwise I'd like to rest on the breeze, the last point I would just make is on the credit point, which is distinct from this argument, although it's related, and that is that Excel should be entitled to a credit of about $900,000 for its overpayment to Pfizer. If you accept, as I think one must, that the policy is limited to $15 million, our payment to Pfizer was a payment of $15,894,000, which was made at a time, and this actually sort of relates back to the law of the case argument, which was made at a time when the district court had held, first of all, that the policy limit was effectively $17 million. We were subject to that ruling because the SIR was gone in the district court. But you're appealing that ruling. I mean, so isn't this payment in excess of your policy a voluntary payment since, I mean, it's still at issue because you're appealing. Right, and that's exactly the right analysis. It's whether it's a voluntary payment,  First of all, when an insurer makes a payment on a policy, it's not voluntary. But more importantly, the case law makes clear that when a party makes a payment, it's effectively coerced by the circumstances. Effectively coerced even though you're appealing it? Yes, because of the threat of pending interest. You might lose that appeal. It's perfectly appropriate for a party to comply with a trial court ruling that you're appealing, make the payment in order to protect oneself against the risk of loss and the risk of interest. That's the key point. So the payment was made under reservation of rights? Not an express reservation of rights, but the fact that we were appealing. The fact that we were appealing is effectively a reservation. Don't you normally have to make an express reservation of rights if it is conditional? There's no requirement of an express reservation. And we cite the third restatement of restitution, which says that you can, and I think Your Honor is exactly right about this, the circumstances, the context tells you whether or not the party is continuing to challenge its obligation to make the payment. And the circumstances here were the fact that we were appealing it. So we were challenging our obligation. But the trial court, I think, has it backwards when it says it was a strategic decision made by Excel to make the payment to avoid its potential liability, to avoid penalty interest. That's exactly, of course, why we made the payment, but that's also exactly why it's not voluntary. This was not a gratuity. This was not a mistake. This was made in order to protect ourselves while we were challenging that ruling. And under those circumstances, the courts say that that's not a voluntary payment. Is there a particular reason why the current claims as to pre-judgment interest offsets and credits, why those were not raised the first time the case was before the Court of Appeals? I don't think they were sort of ripe at that time. And the other side hasn't raised that as an issue. They're quick to shout waiver whenever they can, wherever they want to, and they haven't raised that point. So I don't think that affects the authority of this court to address those issues. Okay, so you assert that they were not ripe to be raised, and so they weren't raised, and so there can be no waiver as to those, but even if they could be waived, the court could always reach them. Certainly the latter is true. And just to be honest, I can't recall what the procedural circumstances were in the first appeal as to whether or not they should have been raised at that point. I don't think they were appropriate to be raised at that point because the issue was a sort of fundamentally different issue about the total damages to which XL could be liable. Once that got resolved, this court remanded for recalculation of penalty interest, and that's where this all came up because we had to determine the correct amount of penalty interest, what the correct sort of principle was, and all of that. So I think this was the time to raise those issues, and I think Your Honor ultimately is correct that this court has the authority to reach those issues no matter what. If there are no further questions? I have none. We'll rest on our briefs for the remainder. Thank you very much, Your Honors. All right. We're going to talk about the other issue, about the interest issue. Yes, that's what I plan on addressing and then briefly rebuttal on the self-insured retention issue. Judge Donald, following up on your point, we argued the first time around about penalty interest in the statute. XL said that we were not entitled to penalty interest. They lost that issue. So we shouldn't be arguing about those issues again. The issue on appeal on the penalty interest is whether or not the district court followed this court's mandate when this court sent it back to the district court to award penalty interest, and that's exactly what the district court did. And by the way, the standard of review, as this court said in Stryker 1, on prejudgment interest is abuse of discretion. But the district court awarded $4.6 million in penalty interest, and I think the opinion is concise and addresses all of the issues. But he said that XL, Stryker was entitled to penalty interest on the $7.6 million in settlements. Those are the ones that had been entered in the 2001, 2002, 2003, up until the time of the exhaustion, that is, the settlement to Pfizer in 2009. Because during the time before there was exhaustion, all of those settlements that Stryker had not been paid because of XL's breach were within the limits, and therefore he awarded penalty interest on those settlements that we still have not been paid today in 2014, but he awarded penalty interest on those settlements up to that date, and that's $4.6 million. And I think the scope of the... That was limited to the $15 million policy? Yes, because underneath, at the time, it was well within the $15 million, and that's what he said, and his analysis was. In fact, he had said before the first appeal, as an alternate ruling, that even if XL had exhausted, which Judge Bell rejected then, it still would be liable for penalty interest up to the exhaustion. This court did not disturb that holding and sent it back, and Judge Bell did exactly what this court instructed it to do, and his ruling on that should be affirmed. Now, there's one point that XL makes that really, I think, needs to be addressed. XL says in its brief that at the time of the exhaustion, on February 2, 2009, XL was only potentially or hypothetically liable to Stryker, and that's just totally inconsistent with the record. Docket number 1056 is a partial judgment that had been entered the year before by the district court for $12.1 million plus 12% penalty interest. The $12.1 million represented all of the settlements and most of the defense costs. And then by the time of the actual settlement with Pfizer, the exhaustion, XL had conceded on the remaining defense costs. So at that point, there was a judgment or liability for $13.9 million plus penalty interest, something like $27 million. So to tell this court that at the time of the Pfizer payment that its liability to Stryker was hypothetical is just wrong, unless a partial judgment doesn't mean anything. And they make that argument to address this court's mandate that the district court had to address actual liability. Well, as the district court said, there was actual liability, and before the Pfizer payment, XL was liable, was actually liable for the $7.6 million in settlements that Stryker had paid the year before. So by exhausting, XL could stop the penalty interest clock, but it could not undo the penalty interest that had been awarded because of XL's breach and its failure to pay for all these settlements that were entered into years before. I mean, I think one of the things that the district court said in his opinion, docket 1201 at page 7, he relied on two undisputed facts in making his award. He said, number one, XL's policy covers the $7.6 million in settlements up to the point of exhaustion, and secondly, XL wrongfully delayed paying any benefits to Stryker for nearly a decade. Now, given the whole purposes of this penalty interest statute that requires timely payment of benefits and requires that an insurance company that does not pay timely benefits must pay 12% penalty interest, there is no other correct result. I mean, XL has taken the position here, Your Honors, where it actually anticipates the obvious question, with not paying benefits for some nine years, how could XL not be liable for penalty interest?  Even though in the settlement, Pfizer never demanded it, and Pfizer gave XL a full release, so they didn't pay anything. XL, in its brief, refers to Pfizer as a third-party claimant three times. The problem with that is they leave out the critical statutory word, which is tort claimant. Under some circumstances, a third-party tort claimant may get penalty interest, but Pfizer was a contract claimant. XL didn't even make that argument to the district court that they were a tort claimant. So the bottom line is, as the district court said, Pfizer was never entitled to penalty interest as a contract claimant. So if you take XL's position on the penalty interest here, Your Honors, they breached the contract, they delayed paying any benefits for some nine years, and they want this court to say that they have to pay no penalty interest on the $15 million limits. That would turn this statute on its head, and I think Judge Bell got it exactly right, and his analysis is spot on. Now, as far as the offset issue, we'll rely on our briefs, the penalty interest, but I would make two points. Judge Bell correctly said that under the statute, a settlement is not an award. The statute only allows an offset for the same interest on the same award. And then he said, even if it is an award, in the language of the statutes, it's not the award that generated penalty interest. Very quickly on two other points. On this overpayment issue, XL agrees that the standard is abuse of discretion. The cases cited in both briefs only allow an insurance company that voluntarily overpays. Here it wasn't even a striker, it was a different entity. Only can recover that amount if there's a mistake of fact. We issued two checks instead of one. Or, and this is even under the restatement that Mr. Hacker refers to, the restatement of restitution. Only if there's a protest or a reservation of rights, you will find no case that allows a voluntary equitable payback of an overpayment absent those circumstances which indisputably do not exist here. If I can go back in my very limited time on the SIR, I want to make one point here, and that is this. The strategic reason XL did not appeal the retention ruling is because the capital reproduction involved the self-insured retention. Judge Bell extended that ruling to amounts over and above. It was a $14 million issue. That was the big ticket item. In its brief, it's opening, it's brief at page 35, and I think this is important. The strategic reason why it didn't appeal the retention ruling, besides the fact that they had paid it long ago, is that they argued, and this is the heading of one of their arguments, capital reproduction does not apply here by its own terms. In other words, capital reproduction involved the self-insured retention. They wanted this court to distinguish capital reproduction because they wanted to get out of the $14 million excess judgment ruling the $2 million that had long been paid and was long ago. So they were arguing it was a better argument to have this court limit capital reproduction than to overrule it completely. That's why they didn't appeal it. That's why it's not in the statement of issues. And the reason it's not, as I said before, they had paid it long ago in a voluntary settlement for their own business purposes. Thank you, Mr. Gatz. Any further questions? Thank you, Your Honors. All right, thank you. Case will be submitted. May call the next case.